UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KRISTEN D. ALTISER,                    )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      No.  2:05CV3 DJS
                                       )                    (TIA)
JO ANNE B. BARNHART, Commissioner      )
of Social Security,                    )
                                       )
            Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

      This cause is on appeal from an adverse ruling of the Social Security Administration.  All

pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b) for appropriate disposition.

**I.      Procedural History**

      On June 20, 2002, Claimant Kristen D. Altiser filed an application for Child's Insurance

Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.  (Tr. 42-43)[1]

and application for Supplemental Security Income payments pursuant to Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381, et seq.  (Tr. 395-98).  In her applications for benefits, Claimant

alleged that she is disabled starting on May 19, 1984, due to complex partial seizure disorder and

frontal lobe damage (lesions).  (Tr. 33, 35, 69, 400).  The Social Security Administration denied

Claimant's claims for benefits.  (Tr. 32-38).  Claimant requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. 39-41, 399-403).  On March 24, 2004, a hearing was

---

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer.
(Docket No. 6/filed June 2, 2005).

held before an ALJ. (Tr. 404-31). Claimant testified and was represented by counsel. (Id.). Jeanne Jarrett, Claimant's mother, also testified at the hearing. (Tr. 420-30). Thereafter, on July 23, 2004, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 12-24). On November 6, 2004, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 7-9). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on March 24, 2004

#### 1.  Claimant's Testimony

At the hearing on March 24, 2004, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 404-20). Claimant testified that she is nineteen years old and her date of birth is May 19, 1984. (Tr. 408, 417). Claimant lives in Hannibal, Missouri with her father as required by the bond in her criminal case and as directed by her mother. (Tr. 409, 411). Claimant completed tenth grade and has unsuccessfully studied for her GED. (Tr. 409). Claimant is on bond for a criminal charge in Adair County, Missouri, stemming from charges of attempting to manufacture methamphetamine and receiving stolen property. (Tr. 413). Claimant testified that the charges are set for trial in August. (Tr. 413).

Claimant testified that she works at a convenience store located in Hannibal running the cash register, stocking the shelves and the deli area, and cleaning. (Tr. 409). There are always other employees around Claimant, because she needs help doing her work, and she had a fight with a co-worker. (Tr. 410). Claimant testified that either her boss or the accountant is present when she works. Claimant testified that she becomes nervous when a lot of people approach the

cash register at the same time. (Tr. 410). When she tried to worker faster to accommodate the crowd of customers, Claimant testified that she came up short. (Tr. 411).

As to her daily activities, Claimant's father wakes her up in the morning one hour before work, and sets out her medicine. (Tr. 411). Claimant brushes her teeth. Claimant's father starts her car, and Claimant drives to work. (Tr. 411). Her father brings her lunch to work and manages her money by placing the extra cash from her cashed paycheck and paying her car payment or car insurance. (Tr. 412). Claimant testified that she has a savings account but not a checking account, because she mismanaged her funds by withdrawing money. Claimant does not have any household expenses, and her mother schedules her doctor's appointments. (Tr. 412). Claimant testified that on an average day, she gets up, goes to work, and returns home. (Tr. 413). Claimant's parents have Claimant report to them where she is at all times. (Tr. 413). Claimant testified that she lived on her own for a short period of time away from her parents, but this did not work out well. (Tr. 417). Claimant explained how she lived in a trailer owned by George Grison for three or four months, but bad people were hanging around the trailer. (Tr. 417-18). Claimant believed these people to be friends at first, but she was uncomfortable living in the trailer. (Tr. 418). Claimant testified that the rent was covered by HUD, and her mother paid the utilities. (Tr. 419). Claimant moved to Eli Street and lived there alone for a month before being evicted by the landlord and being arrested. (Tr. 419).

Claimant testified that she has seizures from time to time. (Tr. 413). When having a seizure, Claimant spaces out. (Tr. 413). Claimant testified that she is fatigued with great frequency, and she has numbness in her hands and feet. (Tr. 414). Claimant testified that she has been told she suffers from depression, but she is uncertain whether she is depressed. Claimant is

sad sometimes. (Tr. 414). Claimant testified that she takes Tegretol for seizure and behavior disorder as prescribed by Dr. McLaren. (Tr. 416-17). Claimant reported the medication has helped her. (Tr. 417).

Before making a decision, Claimant asks her parents for advice. (Tr. 415). A friend of Claimant's father helped place her in her present employment. (Tr. 415). Claimant testified that she becomes upset easily, and she has a short temper. (Tr. 415). Claimant lost her temper earlier in the morning and started cussing. (Tr. 416). Claimant testified that she makes good and bad decisions. Claimant cited keeping her job is an example of a good decision. Claimant could not cite an example of a bad decision. (Tr. 416).

### 2. Testimony of Jeanne Jarrett

Jeanne Jarrett, Claimant's mother, testified in response to questions posed by the ALJ and counsel. (Tr. 420-30). Ms. Jarrett testified that she is Claimant's mother, and she lives in Kirksville, Missouri. (Tr. 420). Ms. Jarrett explained how she is proud of Claimant for keeping her current job the last couple of months and for working almost every day. (Tr. 421). Ms. Jarrett testified that Claimant is living with her father and has restrictions imposed by her father and by the conditions of her bond. Her parents have Claimant call when she leaves and they report to one another when Claimant arrives. Since being arrested in September, Claimant has not been out over night. (Tr. 421). Ms. Jarrett explained that Claimant has a restricted living environment and her father reminds Claimant what time to go to work and to take her medication. (Tr. 422). Ms. Jarrett opined that Claimant would not be succeeding at that time without the rigid structure imposed by her parents. (Tr. 430).

Claimant's parents first learned that Claimant had brain damage when she was thirteen.

(Tr. 422). Ms. Jarrett explained how Claimant always experienced learning problems in school and behavioral problems starting at age twelve. Claimant started acting out by running away from home, leaving school, and placing herself in dangerous situations. For example, Claimant would leave school in the middle of the day and take off with older men and place herself in dangerous situations. Her parents would track her down, or she would end up in the emergency room or being returned by the police. Because of her problems, Claimant was in and out of residential care three or four times during her teenage years. (Tr. 422). While at the Boys and Girls Town, Claimant received psychological treatment and an EEG and a MRI. (Tr. 423). At that time, Claimant's brain damage was first discovered, and she received an IEP for school. (Tr. 423-24). Claimant also received treatment at St. Louis Children's Hospital. (Tr. 423).

Ms. Jarrett opined that Claimant has always fared better when living in a structured environment, because she is happier and able to stay on task. (Tr. 423). Ms. Jarrett opined that Claimant has an understanding of her condition and limitations based on what others have told her. (Tr. 426-27). Claimant uses flight as her coping mechanism for stress or conflict situations. (Tr. 427). Ms. Jarrett testified that Claimant has experienced periods of being fairly stable and recently Claimant has been stable, but this state is the exception to the rule. Ms. Jarrett testified that she was uncertain whether Claimant would get up and go to work if she was left without supervision. (Tr. 427). Ms. Jarrett explained how she has to remind Claimant two or three times to take her medicine, Tegretol. (Tr. 428). Ms. Jarrett opined that Claimant would not attend to her personal needs if left without supervision. (Tr. 428).

After receiving the IEP, Ms. Jarrett explained that Claimant had a fairly successful ninth grade year, and she attended a mix of regular classes and special education classes. (Tr. 425).

Second semester tenth grade year, Claimant started to leave school during the day and had to be home schooled for the remainder of the year.  Near the end of the summer, Claimant returned to residential care at the Better Fields Youth Services in Marshall and stayed there the first three months of her junior year.  Thereafter, Claimant lived with her father and attended school in Milan and was assigned a para-professional to stay with her all day to make sure she attended classes and stayed at school all day.  (Tr. 425).  Because she lost credit hours, Claimant was one year behind in school.  (Tr. 426).  In the summer of 2002, Claimant moved to Kirksville to live with her mother and to attend summer school.  The weekend before summer school ended, Claimant ran away and did not complete summer school.  This started the time when Claimant lived alone before being arrested.  (Tr. 426).

Ms. Jarrett testified that Claimant had problems in past positions, because she would leave her place of employment. (Tr. 423).  Thereafter, Claimant had three or four jobs at fast food restaurants, but Claimant would work a short period of time and then not return to work or leave in the middle of a shift.  (Tr. 423-24).  Ms. Jarrett testified that in Kirksville, Claimant has worked at the Holiday Inn Express and at Casey's, but she left one day and did not return to work.  (Tr. 424).

Ms. Jarrett explained how she recently pursued and received partial guardianship for Kristen.  (Tr. 428).  Before Claimant turned eighteen, Ms. Jarrett had the legal authority to remove Claimant from a situation or place her wherever she deemed appropriate.  But once Claimant turned eighteen, Ms. Jarrett could not do so unless Claimant agreed.  Based on what happened to Claimant the nine months she lived alone, Ms. Jarrett determined that Claimant still needed guidance and someone to make decisions regarding her living situation so that others

would not take advantage of Claimant. (Tr. 428). As an example, Ms. Jarrett explained that when Claimant lived alone, other people would come to her place and eat her food and even physically break into the place if she was not home. (Tr. 429). Ms. Jarrett testified that these people stole Claimant's clothes and personal belongings and trashed her place. Ms. Jarrett opined that Claimant has not been able to prevent others from taking advantage of her, and anyone she meets, she treats as a friend. (Tr. 429).

Ms. Jarrett explained that the doctors have had a difference of opinion regarding Claimant's behavioral problems. (Tr. 429). The first couple of neurologists attributed her problems to a complex partial seizure disorder. (Tr. 429). A couple years later, Dr. Susan Arnold at St. Louis Children's Hospital attributed Claimant's behavioral problems to damage to the frontal lobe area of her brain based on a series of tests. (Tr. 430). The tests revealed Claimant's abnormal brain activity. Ms. Jarrett testified that the doctors agree that Claimant's behavior is related to permanent brain damage, and Claimant will not experience any change. (Tr. 430).

### 3. Open Record

During the hearing, counsel requested to submit additional evidence including recent records from Dr. McLaren and from Preferred Family and a statement from Claimant's employer. (Tr. 406, 431). A review of the record shows that the ALJ submitted additional evidence, the consultative examination performed by Dr. James L. Tichenor, Ph.D., on April 1, 2004, and the psychiatric evaluation performed by Dr. Jeffrey Harden on April 5, 2004, for counsel's review before he issued the decision denying Claimant's claims for benefits. (Tr. 136, 140-42, 370-84). Counsel submitted additional evidence to the ALJ, including recent medical records by Dr.

McLaren, a statement by Claimant's employer, and a letter from Dr. Harden, before the ALJ

issued a decision denying Claimant's claims for benefits. (Tr. 143-45, 390-94).

### 4. Forms Completed by Claimant

In the Disability Report Adult completed on June 14, 2002, Claimant reported that

although she became unable to work at birth, she had always had the condition but had been able

to complete limited work. (Tr. 69). Claimant stopped working in April 2001, because she quit

her job. (Tr. 69).

## III. Medical Records

In 1994, a psycho educational evaluation completed by the Jefferson City Public Schools

assessed Claimant with a full scale IQ score of 80, a verbal IQ score of 90, and a performance IQ

score of 73. (Tr. 151, 166-76). The team evaluating Claimant found that Claimant does not meet

the eligibility criterion to be classified as learning disabled or language disordered student. (Tr.

168). The team determined that Claimant's noted discrepancies in performance were not

primarily caused by visual or auditory acuity deficits, mental retardation, or emotional

disturbance. (Tr. 168). Using the Wechsler Intelligence Scale for Children-Revised, the examiner

opined that the IQ results were a valid assessment of Claimant's cognitive abilities, and scores

were 90 verbal, 73 performance, and a full scale IQ of 80. (Tr. 171).

On June 26, 1997, on referral by her family Dr. Jeffrey Harden, D.O., completed a

psychiatric evaluation of Claimant. (Tr. 335). Although Claimant denied suicidal ideation,

Claimant admitted a past suicide attempt at age 12 by taking an overdose of Tylenol. (Tr. 335).

Based on Claimant's records and his evaluation, Dr. Harden prescribed Prozac. (Tr. 336). On

July 24, 1997, Claimant's parents reported Claimant's significant impulsive and oppositional

defiant behaviors, and Dr. Harden recommended placement in a residential care setting. (Tr. 336).

The EEG performed on December 2, 1997, revealed an abnormal electroencephalogram with paroxysmal slowing and bi-hemispheric sharp discharge consistent with generalized seizure disorder. (Tr. 337).

On December 19, 1997, on referral by Dr. Frederick Witt of Boys and Girls Town of Missouri, Dr. Sheila Balog, a Ph.D., at St. Louis Children's Hospital, completed an evaluation of Claimant's current personality functioning. (Tr. 322-29). Dr. Balog noted Claimant has a history of promiscuity, truancy, parent/child problems, and running away. (Tr. 322). Claimant reported difficulties starting one year earlier after being raped by an older man. (Tr. 323). Claimant reported being hospitalized four to five times in the last eight to nine months. Dr. Balog noted that Dr. Witt's psychiatric evaluation resulted in Claimant's diagnosis of oppositional defiant disorder, and a history of depressive disorder. (Tr. 323). Dr. Balog noted that Claimant obtained a performance IQ of 73, and Claimant's academic problems were primarily related to truancy, poor attention span, and defiant behavior. (Tr. 324). Dr. Balog diagnosed Claimant with oppositional defiant disorder and antisocial personality traits with narcissistic features and recommended long-term, individual psychotherapy and family therapy. (Tr. 328).

On referral by Dr. Witt, Dr. Sudhir Batchu, a neurologist, completed a neurology consultation on January 31, 1998. (Tr. 338-39). Based on the neurological examination and Claimant's history of bipolar disorder and abnormal EEG, Dr. Batchu ordered a MRI of Claimant's brain. (Tr. 339). The MRI completed on February 13, 1998, revealed a few tiny high-signal lesions in the white matter of each cerebral hemisphere of uncertain etiology and

significance.  (Tr. 340).  In a letter dated February 17, 1998, Dr. Batchu stated that Claimant has

been his patient since January 31, 1998, for treatment of complex partial seizures, and Claimant

would benefit from placement in classes for special services at school.  (Tr. 342).  On February

21, 1998, Dr. Batchu checked Claimant's Depakote levels.  (Tr. 343).

On referral by the Family Mental Health Center, the St. James R-I School District

completed a diagnostic staffing summary on February 24, 1998.  (Tr. 105-11).  Claimant's

cognitive abilities were assessed by the school psychologist, Dr. Hale, using the Wechsler

Intelligence Scale for Children-Third Edition.  (Tr. 106).  Dr. Hale noted that the results

perceived to be valid and the scores were verbal 78, performance 80, and a full scale IQ of 77.

(Tr. 106, 151).  Dr. Hale noted that Claimant's previous assessment results indicated a full scale

IQ of 80.  (Tr. 106).  Dr. Hale opined that the similarity of the two scores helps to reinforce each

test's validity and reliability, and Claimant is performing within the borderline range of intellectual

functioning.  (Tr. 106).  Dr. Hale noted that Claimant has a significant history of behavioral

concerns for more than six months.  (Tr. 107).  Dr. Hale opined that Claimant responds well to a

structured environment.  (Tr. 107).

In the Recommendation for Release from Boys and Girls Town of Missouri, Claimant's

IQ is listed as 80.  (Tr. 99).  Claimant's initial diagnosis listed oppositional defiant disorder,

history of depressive disorder, consider parent-child problem, consider post-traumatic stress

disorder, and do not disregard the possibility of substance abuse on Axis I, narcissistic and

borderline traits on Axis II.  (Tr. 99).  Listed as the reasons for referral are runaway, promiscuity

(sexual relations with older men), truancy, parent/child problems, and victim of sexual abuse.  (Tr.

99).  Martha Walden, a ACSW and a licensed social worker, opined that Claimant did not

demonstrate signs of depression while in placement from November, 1997 through May, 1998. (Tr. 100, 102). Upon discharge, Ms. Walden recommended Claimant receive aftercare treatment through the Family Mental Health Center including individual and family therapy and possible follow-up with a psychiatrist for medication monitoring. (Tr. 104).

On March 18, 1998, on referral by Dr. Witt, Dr. Royal Grueneich, a pediatric neuropsychologist, completed a neuropsychological assessment to ascertain Claimant's cognitive functioning and to recommend treatment. (Tr. 150-54). In the reason for referral, Dr. Grueneich noted that Claimant has a history of behavioral and academic difficulties. (Tr. 150). Dr. Grueneich reported that an earlier psychological evaluation completed by Sheila Balog, a Ph.D. in the Psychology Department at St. Louis Children's Hospital, documented Claimant's history of sexually risky and promiscuous behavior, truancy, parent/child problems, and running away after having been raped by an older man. Dr. Grueneich reported that Claimant has had several psychiatric hospitalizations since March, 1997. The results of Dr. Balog's psychological evaluation reveal that Claimant exhibits a tendency to deny that problems exist, to simplify or over-personalize situations, and to act impulsively. Claimant has a mercurial personality appearing friendly at one time but impulsive and aggressive at another. Dr. Balog opined that Claimant is developing a personality style which would place her at high risk for self-destructive behavior and unstable interpersonal relationships. (Tr. 150). After the evaluation, Claimant was diagnosed with a seizure disorder. (Tr. 151). A MRI completed on February 13, 1998, revealed the presence of tiny high-signal lesions in the white matter of each frontal lobe and the left parietal lobe. (Tr. 151). Dr. Grueneich opined that Claimant's current intelligence results were somewhat lower than earlier results, and attributed the relatively small discrepancy in results to measurement

error and use of different IQ tests than to an actual decline in general cognitive ability. (Tr. 152). Claimant's scored an estimated overall IQ score of 66. (Tr. 155).

On April 2, 1998, Dr. Robert Silvers examined Claimant to give a second opinion noting that Claimant had been evaluated by Dr. Batchu. (Tr. 146). Dr. Silvers noted that Claimant has been treated for behavioral problems starting one year earlier and has been diagnosed with depression and bipolar disorder. Claimant has been prescribed Ritalin, then Prozac, and currently Depakote. Dr. Silvers noted there is a question concerning Claimant's mental status function with respect to concentration and attention span. (Tr. 146). Examination revealed Claimant's mental status including intellect, memory affect, judgment and insight to be within normal limits. (Tr. 147). Dr. Silvers opined that Claimant has suspected paroxysmal disorder with neurobehavioral disturbance, etiology to be determined. (Tr. 148). In a neurologic follow-up visit, Dr. Silvers reported Claimant's EEG was abnormal, exhibiting nonfocal, paroxysmal features and her MRI was negative. Dr. Silvers opined that Claimant has a generalized seizure disorder. (Tr. 149).

The MRI of Claimant's head completed on April 3, 1998, revealed an abnormal scan of the brain remarkable for areas of enhancement in the subcortical white matter viewed on the right frontal area. Dr. David McLaren opined that the white matter represents areas of early demyelination or previous multicentric neoplasm and advised clinical correlation. (Tr. 189-90). The EEG report noted an abnormal EEG due to dysrhythmic features, nonfocal. (Tr. 191). Dr. Silvers opined that the results might relate to a clinical diagnosis of paroxysmal disorder. (TR. 191).

On May 7, 1998, on referral by Dr. Witt for re-evaluation, Dr. Grueneich completed a neuropsychological assessment because of observations of apparent decline in Claimant's

cognitive functioning subsequent to the previous assessment completed on March 18, 1998. (Tr. 159-65). Dr. Grueneich noted that problems in Claimant's memory and difficulties in interpreting language had been observed. (Tr. 159). Dr. Grueneich opined after completing the evaluation that Claimant's performance was generally comparable to, or even somewhat higher, that her previous results with the exceptions in Claimant's ability to learn and recall a list of words and to flexibly shift between use of different criteria. (Tr. 159-60). Dr. Grueneich found evidence of a modest and selective decline in Claimant's neuropsychological functioning since the previous assessment. (Tr. 160). Dr. Grueneich recommended Claimant be referred for additional neuropsychological evaluation if she continues to demonstrate further decline in memory skills or cognitive functioning. (Tr. 160). In the summary of the results reported to Dr. Witt, Dr. Grueneich reported Claimant's current performance to be generally comparable to her results in March, 1998, and noted the two exception areas as cited earlier. (Tr. 164).

On July 21, 1998 on referral by Dr. Robert Buffaloe, Dr. Steven Rothman, a professor of neurology and pediatrics at Washington University, examined Claimant to provide a second opinion regarding her complex neuropsychiatric symptoms. (Tr. 225-27). Based on his review of Claimant's complete history, previous EEG reports, MRI scans, and physical and neurological examinations performed on Claimant, Dr. Rothman determined that it is unlikely that Claimant has an underlying neurologic disorder and opined that he would like to repeat her MRI and EEG in two to three months and continue her Tegretol prescription. (Tr. 225). Dr. Rothman noted that Claimant has a complex neuropsychiatric history and her chief complaint is staring spells for approximately six months. After changing from Depakote to Tegretol in April, 1998, Claimant reported significant improvement not only with her staring spells but her behavior. (Tr. 225).

Review of the two EEG reports revealed no mention of generalized spike and wave, or other specific epileptiform abnormalities. (Tr. 226). With respect to Claimant's staring spells, Dr. Rothman was not convinced that they were seizures inasmuch as her reported EEG abnormalities were relatively non-specific. Dr. Rothman decided to continue Claimant's Tegretol prescription because of Claimant's reported behavior improvement while taking the medication. In particular, Dr. Rothman concluded: "[i]n terms of the remainder of her psychiatric and behavioral history and her abnormal MRI scans, I am not certain that this fits any specific neurodegenerative disease, as she seems to be improved over the last six months." (Tr. 226). In conclusion, Dr. Rothman determined that Claimant's examination revealed no abnormalities, and he recommended continued use of Tegretol and repeat EEG and MRI tests in three months. (Tr. 227).

Starting in October, 1998, through February 4, 2000, Claimant received treatment at a clinic for viral pharyngitis, headaches, rashes, nasal congestion, and various other ailments. (Tr. 286-93). On August 5, 2002, Claimant returned for her annual physical examination. (Tr. 294). The examiner noted that Claimant was recently hospitalized for alcohol poisoning. (Tr. 294). Claimant reported that she is living with her significant other in Kirksville and will be attending last year of high school. The examiner noted that Claimant's seizures are controlled by Tegretol. (Tr. 294).

On November 17, 1998, Dr. Silvers ordered a MRI of Claimant's head stemming from her partial seizures. (Tr. 206). Dr. Allyn Sher observed multiple tiny hyperintense white matter lesions in the deep as well as the subcortical white matter bilaterally. As compared to the MRI completed on April 3, 1998, Dr. Sher noted no significant change in appearance of the white matter lesions and no definite new areas of abnormal signal intensity. (Tr. 206). In the

Impression section, Dr. Sher found persistent abnormal MRI scan of Claimant's brain with multiple small hyperintense white matter lesions present in the subcortical and deep white matter bilaterally with no significant changes observed when compared to the April 3, 1998, scan. (Tr. 207). In the EEG report, Dr. Sher found a mildly abnormal EEG due to the presence of paroxysmal slowing during drowsiness that may be within the broad limits of normal but the paroxysmal nature of the slowing was to be potentially epileptiform. Dr. Sher recommended clinical correlation. (Tr. 208).

Claimant was treated for "high risk meds, seizures" at Columbia-Regional Hospital on February 18, 1999. (Tr. 209).

The EEG test results completed on April 19, 2000, revealed a mildly abnormal EEG due to mild slowing of the background activity and intermittent slowing with paroxysmal and sharp character. (Tr. 214). Dr. Sher noted that there appeared to be potentially epileptiform, but no definite abnormal focal or epileptiform discharges, and so he recommended clinical correlation. (Tr. 214).

The Individual Education Program ("IEP") update completed on April 26, 2000, noted Claimant to be placed in 100% special education classes for her tenth grade year. (Tr. 177-86). The IEP team noted in the present level of performance the following:

> Kristen exhibits a tendency to deny that problems exist, to simplify or over-personalize situations and acts impulsively. She may appear friendly and outgoing at one moment, then impulsive, aggressive and hostile in the next moment. She experiences complex partial seizures. Her seizures appear to be of the type that she has periods of time in which she stares blankly, experiences periods of forgetfulness, hand tremor, twitching.

> The current special services case manager has observed Kristen to demonstrate remarkable clerical skills. Her use of the computer for word

processing activities, internet search, and filing tasks have consistently met with remarkable demonstrated competence and were completed in a positive expeditious manner. It should be noted there was no observable carry-over in these activities when they were required in a classroom or academically-oriented setting.

(Tr. 178).

On April 28, 2000, on referral by Dr. Silvers, Dr. David McLaren evaluated Claimant for her staring spells and behavioral abnormalities. (Tr. 243). After examining Claimant, Dr. McLaren diagnosed Claimant with seizure disorder and prescribed Depakote and referred Claimant to Dr. Lyskowski for evaluation to determine what medication could better control her obsessive/compulsive disorder. (Tr. 245). In a follow-up visit on June 12, 2000, Dr. McLaren noted Claimant to be doing much better and observed her having a clearer mental status. (Tr. 246). Dr. McLaren noted that Claimant is taking Paxil and increased her Depakote prescription and decreased her Tegretol prescription. (Tr. 246).

On June 12, 2000, Dr. McLaren had Claimant admitted to Columbia Regional Hospital to run tests and to treat her complex seizure disorder. (Tr. 215).

In a follow-up visit on August 8, 2000, Dr. McLaren noted how Claimant was currently in a detention center, Butterfield residential facility, for running away from home again and prescribed Depakote. (Tr. 247).

In a follow-up visit on October 9, 2000, Claimant reported having some staring spells. (Tr. 248). Dr. McLaren ordered a MRI scan of Claimant's brain to check its stability. (Tr. 248). Dr. McLaren had Claimant admitted to Columbia Regional Hospital to run tests and to treat her complex partial epilepsy. (Tr. 218, 248).

On October 24, 2000, Dr. McLaren ordered a MRI of Claimant's head for diagnosis of

Claimant's complex partial epilepsy.  (Tr. 222-23).  The MRI results revealed persistent MRI scan of the brain with multiple small hyperintense white matter lesions without significant interval changes when compared to the scan completed on November 17, 1998.  (Tr. 223).  Dr. Sher noted no significant change in the pattern and distribution of the white matter lesions.  (Tr. 223).

In a follow-up visit on January 25, 2001, Dr. McLaren noted that Claimant is doing fine with no changes and indicated she should return in six months.  (Tr. 249).

In the Progress Note of May 2, 2001, Claimant reported a history of marijuana and cocaine use during her initial therapy session with Dr. Khan.  (Tr. 350).  Claimant's diagnosis included major depressive disorder, marijuana and cocaine abuse, and seizure disorder.  (Tr. 350-51).  Dr. Khan prescribed Celexa and ordered Claimant to see a therapist on a weekly basis.  (Tr. 351).  In the follow-up visit on May 14, 2001, Claimant reported improvement on Celexa.  (Tr. 352, 354).  Her father reported that Claimant's attitude had improved and her relationships with other teenagers during family therapy.  (Tr. 352, 354).  During the therapy session with counselor VanVleck, Claimant admitted her primary issues stems from running away.  (Tr. 353).  Claimant reported heavy marijuana use before moving into her father's house.  Claimant reported having problems with her relationship with her parents, running away, anger, depression, and self esteem.  Claimant admitted having a DYS worker stemming from an incident where she was riding in a stolen car during a high-speed police chase.  (Tr. 353).

On May 30, 2001, on referral by Dr. Robert Buffaloe, Dr. Susan Arnold, an assistant professor of pediatrics and neurology at St. Louis Children's Hospital, examined Claimant to provide a second opinion regarding her diagnosis of epilepsy.  (Tr. 228-30).  Dr. Arnold noted that Claimant has been seen by Dr. Rothman in 1998 for a similar concern and has since been seen

by Dr. Silvers and most recently Dr. David McLaren for management of her presumed epilepsy. (Tr. 228). Dr. Arnold noted that Claimant withdrew from school earlier in the year because of poor attendance. (Tr. 229). Her mother reported that her family hoped Claimant would do better in a workplace environment, but noted Claimant had walked away from several jobs when under stress. Dr. Arnold noted that Claimant has episodes occurring about once every two days with staring and decreased responsiveness, but Dr. Arnold questioned whether these episodes in fact represent seizures. Dr. Arnold noted that frontal lobe lesions as seen on the MRI scans can be present with behavioral and attention problems such as Claimant is manifesting. Dr. Arnold recommended admission for a video EEG to better characterize Claimant' current episodes and to determine if they are seizures. (Tr. 229).

On June 6, 2001, during the second therapy session with counselor VanVleck, he noted that the session had been rescheduled three times by Claimant, and she still showed up at the wrong time. (Tr. 355). Counselor VanVleck opined that he finds Claimant confusing and unwilling to discuss her past history of sexual abuse. (Tr. 355).

In the neuropsycholgical assessment report dated July 3, 2001, performed by Dr. Stephen Kanne, a pediatric neuropsychologist at St. Louis Children's Hospital, he assessed Claimant's current level of cognitive functioning and made treatment recommendations at her mother's request. (Tr. 231-37). Dr. Kanne interviewed Claimant's parents, observed Claimant and her behavior during the assessment, and reviewed Claimant's school and medical records. (Tr. 231). Dr. Kanne noted that Claimant had been evaluated in the clinic in May, but since that time Claimant had run away and been readmitted to Butterfield Youth Services residential facility. (Tr. 231-32). Dr. Kanne listed Depakote and Celexa as Claimant's current medications. (Tr. 232).

Neurologically, Claimant has been diagnosed with a partial-complex seizure disorder with her seizures consisting of periods of staring and decreased responsiveness. (Tr. 233). Dr. Kanne noted that Claimant's overall intellectual level was in the borderline range, FSIQ ==77, in 1998 and low average range, FSIQ = 80, in 1994. Claimant's parents reported that they have observed a pattern of escalation regarding her behavioral difficulties such as at first leaving places for a short period of time escalating to the point of leaving for an extended period of time. Claimant's parents reported that her truant behaviors prevent her from engaging in stable work or consistent schooling. (Tr.233). Due to her inability to remain in school or keep a job, Claimant's parents expressed concern concerning Claimant's future. (Tr. 234). Dr. Kanne opined that the results from the current neuropsycholgical evaluation were consistent with Claimant's past evaluations. (Tr. 235). In particular, Dr. Kanne noted that "[a]lthough it may appear as if her level of intellectual functioning is declining (e.g., 1994, SS=80; 1998, SS = 77; currently, SS = 66), her decreasing performance likely reflects her lack of progression at the same rate as her same-aged peers." (Tr. 235).

On September 27, 2001, an IEP team at Butterfield Youth Services drafted an IEP for Claimant placed Claimant in a self-contained classroom setting. (Tr. 251-63).

On October 1, 2001, Dr. McLaren treated Claimant for her behavioral abnormalities and noted that Claimant's recent twenty-four hour continuous video EEG revealed Claimant to be within the normal limits for her age. (Tr. 250). Dr. McLaren concluded his treatment as follows:

> At this point, I do not think I can be of really great further help in terms that this is predominantly a psychiatric abnormality. If the family wants to pursue longer than 24-hour video EEG monitoring, then they should probably do so with Dr. Arnold who is one of the nation's pediatric epileptology experts. She complains of being cold all the time, headaches, and many other problems, but it is to the point that it

is difficult to take her seriously and know whether she is being truthful or not. (Tr. 250).

In a return visit on November 5, 2001, Dr. Khan noted that another psychiatrist had changed Claimant's medications since her last visit. (Tr. 356). The other doctor prescribed Tegretol and stopped Claimant's Depakote and Celexa prescriptions. Claimant's father reported that the new medications had helped Claimant by stabilizing her mood. (Tr. 356).

In the Evaluation Report of the Milan C-2 Schools on November 16, 2001, the counselor determined Claimant qualified for services as a special education student, because Claimant exhibited difficulties in learning and in controlling behaviors necessary for her to be successful in a regular classroom setting. (Tr. 264-67). In the IEP meeting on January 15, 2002, it was noted that the current decision of the IEP team was to place Claimant in a self-contained setting with integration into the regular classroom with a paraprofessional. (Tr. 269-85).

On January 28, 2002, Dr. Khan continued Claimant's Tegretol prescription at the same dosage. (Tr. 357). Claimant's father reported Claimant doing fairly well overall, but Claimant at times becoming agitated at school. (Tr. 357).

In a letter dated February 22, 2002, Denise Czuba, an intake worker at the Department of Mental Health, informed Claimant's mother that effective February 8, 2002, Claimant would be eligible for Kirksville Regional Center services. (Tr. 344-45).

On June 17, 2002, Dr. Khan noted that Claimant is doing very well. (Tr. 358). Claimant reported not having any recent problems. Claimant's mother requested continued use of Tegretol not only for the remote possibility of Claimant's seizures but also for her behavioral problems. Dr. Khan continued Claimant's medications. (Tr. 358).

In a return therapy visit on June 24, 2002, with counselor VanVleck, Claimant reported an incident at school involving a boy. (Tr. 359). After the boy expressed interest in her, Claimant explained how she wanted to be friends. Out of anger, the boy punched the locker next to Claimant and threatened her. Claimant discussed how the incident made her feel and her feelings of fault. (Tr. 359). In a follow-up visit on September 17, 2002, Claimant reported family turmoil and issues of substance abuse. (Tr. 360). Claimant reported her parents forcing her to start taking Tegretol again without consulting a doctor. Counselor VanVleck assisted Claimant in making an appointment with the psychiatrist who initially prescribed the medication. Claimant also reported a physically abusive boyfriend to his friends. (Tr. 360).

In the Psychiatric Review Technique completed by Dr. Stanley Hutson, Ph.D., on behalf of Disability Determinations, on October 1, 2002, Dr. Hutson noted that he based his medical disposition on organic mental disorders. (Tr. 297-310). Dr. Hutson listed Claimant's medically determinable impairment to be frontal and parietal lobe lesions substantiated by behavior problems, learning problems, depression, and a questionable seizure disorder. (Tr. 298). Dr. Hutson opined that there was insufficient evidence to substantiate mental retardation. (Tr. 301). Dr. Hutson determined that Claimant has moderate restriction of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. 307). Dr. Hutson noted that Claimant alleges frontal lobe damage and seizure disorder cause her disability and concluded based on the medical records that Claimant has a severe mental disorder that does not meet or equal a listing. (Tr. 309). In the Mental Residual Functional Capacity Assessment, Dr. Hutson found Claimant to be either not significantly limited or moderately limited in her understanding and memory, sustained concentration and persistence, social

interaction, and adaption. (Tr. 311-12). In the Functional Capacity Assessment, Dr. Hutson noted that Claimant has reported behavior problems with running away, impulsiveness, and irritability. (Tr. 313). Dr. Hutson opined that Claimant would benefit from continued home structure and treatment at a regional center, and she could manage her truant behavior with some consideration, treatment, and support. Dr. Hutson noted that Claimant's medical evaluation shows her neurological difficulties to be non-progressive. Dr. Hutson found that Claimant has the ability to do routine work in a low stress work setting. (Tr. 313).

On October 3, 2002, Claimant reported how she decided to stop taking her medications for about a month or two. (Tr. 361). While not taking her medications, Claimant reported being moody, and so she decided to go back on the medications on her own, and her mood improved. Dr. Khan noted that Claimant's only current medication is Tegretol. (Tr. 361).

On referral by the Section of Disability Determinations, Dr. James Tichenor, Ph.D., conducted an intellectual evaluation with mental status evaluation of Claimant on October 15, 2002. (Tr. 315-21). Claimant scored a full scale IQ of 72 on the WAISIII, placing her within the borderline range of general intellectual functioning. (Tr. 316-17).

In a letter dated October 16, 2003, Dr. McLaren opined as follows:

Kristen Althiser's [*sic*] mother has asked me to write a letter regarding the fact that Kristen has suffered traumatic brain injury as an infant likely from a fall from a pickup truck. The patient has had abnormalities on her MRI scans involving the frontal lobes. This traumatic brain injury may certainly cause significant difficulties with her learning disabilities as well as causing difficulties with judgment, forethought, and planning. She has asked me to write this note so that it may be taken into consideration with her current legal difficulties.

(Tr. 369).

On November 25, 2002, Dr. McLaren noted that Claimant is doing well living on her

own, but she still has mood swings. (Tr. 379). Dr. McLaren noted that Claimant is not good about taking the Tegretol prescription as prescribed but that she seems to do better when she takes Tegretol. (Tr. 379). Dr. McLaren ordered tests to check Claimant's blood work because of the Tegretol prescription and her weight loss. (Tr. 362-64, 379).

On October 20, 2003, the Circuit Court of Adair County appointed Jeanne Jarrett as limited guardian of Claimant and empowered her to manage Claimant's residential placement, maintain her medications and medical treatment, and manage her vocational rehabilitation (medical to include psychological). (Tr. 137-39).

On October 27, 2003, during an office visit, Janet Samuels, a RN, noted that Claimant has not been very regular at taking her medications as prescribed, and she encouraged Claimant to take the medication twice a day. (Tr. 380).

On December 9, 2003, Claimant returned to Dr. McLaren's office for follow-up treatment. (Tr. 381). Claimant's mother reported that Claimant is doing better, and she has not had many problems with respect to behavioral difficulties. Claimant denied any mood swings and reported feeling fine on the Trileptal prescription. Claimant reported working at the same job at a convenience store in Hannibal for two months. Dr. McLaren opined that he did not believe that Claimant has a seizure disorder. (Tr. 381).

In a statement dated March 30, 2004, Carol Wilson, the manager of the convenience store where Claimant works, explained that Claimant first worked the evening, second shift when she started in October, 2003, but based on a co-worker's complaint regarding Claimant's inability to do the job, she moved Claimant to a day shift and provided her with additional training. (Tr. 143). Ms. Wilson further explained that Claimant usually works at the same time she does or the

bookkeeper so that they can provide Claimant with additional supervision. Ms. Wilson concluded by noting that Claimant "does fairly well" with this additional supervision. (Tr. 143).

On April 2, 2004, on referral by Disability Determinations, Dr. James Tichenor, Ph.D., evaluated Claimant. (Tr. 370-71). Claimant reported not abusing alcohol or drugs, but reported being arrested for attempted manufacture of methamphetamine in August, 2003, and awaiting trial. (Tr. 370-71). Claimant denied past suicide attempts. (Tr. 371). Claimant reported taking Tegretol twice a day. Claimant reported having a good childhood with no physical or sexual abuse. Claimant has worked full time the last six months at a convenience store and reported enjoying her work. Claimant noted that her supervisors schedule her with someone at all times in case she has a seizure. Dr. Tichenor found Claimant to be functioning reasonably satisfactory at that time and able to function in a mildly competitive work environment so long as her seizure activity is held in check. Dr. Tichenor determined her GAF to be 70. (Tr. 371). In the Medical Source Statement of Ability To Do Work-Related Activities (Mental), Dr. Tichenor found Claimant to be moderately restricted in her ability to carry out detailed instructions and slightly impaired to understand and remember detailed instructions and ability to make judgments on simple work-related decisions. (Tr. 372). Dr. Tichenor further opined that Claimant is moderately restricted in her ability to respond appropriately to work pressures and slightly restricted in her ability to interact appropriately with the public or to respond appropriately to changes in a routine work setting. (Tr. 373).

On April 5, 2004, on referral by Disability Determinations, Dr. Jeffrey Harden, a D.O., completed a psychiatric evaluation of Claimant. (Tr. 374-76). Claimant reported daily seizures during which time she spaces out for a few seconds and taking medications for the seizures. (Tr.

374). Claimant denied any ongoing use of alcohol or illicit substances. (Tr. 375). With respect to her employment history, Claimant reported having six jobs throughout her life and never having been fired from a job. Claimant noted that she is currently working at a convenience store and not having significant difficulties with coworkers, bosses, or customers. (Tr. 375). Dr. Harden assessed her current GAF to be 55. (Tr. 376). In the Medical Source Statement of Ability To Do Work-Related Activities (Mental), Dr. Harden opined that Claimant is slightly restricted in her ability to understand and remember detailed instructions, carry out detailed instructions, and to make judgments on simple work-related decisions. (Tr. 377). Dr. Harden further opined that Claimant's impairment does not affect her ability to respond appropriately to supervision, coworkers, or work pressures in a work setting. (Tr. 378).

In undated statements, Jeanne Jarrett, Claimant's mother, documented two occasions when Claimant failed to be where she had planned. (Tr. 144-45). On April 11, 2004, Claimant planned to drive from Hannibal to Kirksville for a visit with her family. (Tr. 144). Claimant left work two hours early, but did not go to her mother's house as anticipated. Instead, as reported by Claimant, she visited friends and drove to Salem with the friends instead of going to her mother's house and visiting relatives. Ms. Jarrett reported that Claimant did not contact anyone in her family, and the family searched for Claimant for three days. Although Claimant was scheduled to work on Wednesday, she called in sick and returned to work on Thursday. When she returned, Claimant apologized for her disappearance and agreed that she had not made a good decision in disappearing. Ms. Jarrett opined that this "disappearing behavior" is characteristic of Claimant's past impulsive behavior and is usually triggered by stress in her life. (Tr. 144). In June, 2004, Claimant was scheduled to report to work at 7:00 a.m., but she failed to report at

work that time, and, instead, went to the hospital reporting chest pain. (Tr. 145). Claimant reported having numerous tests done and receiving a medical excuse. Ms. Jarrett opined that Claimant felt stress due to her frequent schedule change at work. (Tr. 145).

In a letter following a discussion on May 11, 2004, with Jeanne Jarrett regarding the psychiatric evaluation of Claimant, Dr. Harden noted that Ms. Jarrett apprised him of some inaccuracies and misrepresentations made by Claimant during the evaluation. (Tr. 392-93). First, Dr. Harden noted that Claimant denied any ongoing difficulties with coworkers or supervisors in the workplace. (T. 392). Ms. Jarrett clarified and cited two instances where Claimant had been fired from jobs. Further, Ms. Jarrett shared with Dr. Harden the conflict Claimant had with a coworker who refused to work the same shift as Claimant. Ms. Jarrett further pointed out how Claimant requires frequent prompting to take her prescription medications on a prescribed basis and similar prompting for maintenance of personal hygiene. (Tr. 392). Ms. Jarrett also noted that the probate court had awarded her limited guardianship of Claimant finding her to be a partially incapacitated person. (Tr. 392-93). Based on the additional information provided by Ms. Jarrett, Dr. Harden changed his opinion regarding Claimant's ability to respond appropriately to supervisors, coworkers, and work pressure in a work like setting. (Tr. 393). Based on the additional information provided by Ms. Jarrett, Dr. Harden opined as follows:

> It is now my opinion that Kristen shows a slight impairment in her ability to interact with the public. She shows a moderate impairment in her capacity to interact appropriately with supervisors and a marked impairment in her ability to interact appropriately with coworkers. I further believe that she shows a marked impairment in her capacity to respond appropriately to work pressures in a usual work type setting. I believe that she would show a slight impairment in her ability to respond appropriately to changes in routine work settings. My diagnostic impressions in light of this information are altered on Axis II to include not only the borderline to mild mental retardation but also mixed personality disorder with

- 26 -

borderline and dependent features (possibly as a consequence of her history of seizure disorder and brain injury). I believe this is an accurate representation of the information that you and I reviewed.

(Tr. 393).

In a letter dated June 10, 2004, Dr. McLaren opined as follows:

Kristen Altiser is a patient of mine that I have been treating for a seizure disorder for about four years. Kristen's medical history includes both a traumatic brain injury at seven years of age and an ear infection with febrile response in excess of 104 degrees. Kristen has had abnormal electroencephalogram (EEG) and magnetic resonance imaging (MRI) testing. She suffers from behavior abnormalities such as obsessive compulsive disorder and emotional problems.

It is my medical opinion that Kristen is disabled from a neuropsychaitric standpoint. I think she would benefit tremendously from continuous psychiatric treatment and a evaluation for disability would be appropriate.

(Tr. 382).[2]  In the Medical Statement Concerning Organic Brain Syndrome for Social Security Claim, Dr. McLaren noted that Claimant has a memory impairment, a disturbance in mood, and an emotional impairment.  (Tr. 383).  Dr. McLaren found that Claimant has a mild restriction of activities of daily living and a moderate ability to maintain social functioning.  Dr. McLaren noted that Claimant has a history of one year or more of being unable to function outside a highly supportive living arrangement.  (Tr. 383).  Dr. McLaren also determined that Claimant is markedly impaired in her ability to understand and remember detailed instructions, to perform activities within a schedule, and to sustain an ordinary routine without special supervision.  (Tr. 384).

## IV.    The ALJ's Decision

The ALJ found that Claimant is the child and a dependent of a wage earner who has

---

[2]"A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

remained unmarried at all relevant times and will reach age 22 on May 19, 2006.  (Tr. 23).  The ALJ determined that although Claimant has not engaged in substantial gainful activity since birth, she has held various jobs and had earnings since 1998, but the jobs would not have constituted substantial gainful activity in terms of duration of employment or amounts of average monthly earnings set forth in the earnings guidelines of 20 C.F.R. §§ 404.1574 and 416.974.  (Tr. 23).

The ALJ found that the medical evidence establishes that Claimant has borderline intellectual functioning and a history of seizure-like activity, but no impairments or combination of impairments which meet or equal the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 23).  The ALJ explicitly found "[f]irst of all, the claimant is not mentally retarded."  (Tr. 21).  The ALJ found that the allegations of impairments by Claimant and her mother precluding all substantial gainful activity are not consistent with the evidence and are not credible.  (Tr. 23).

The ALJ opined that Claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except work involving more than simple and repetitive tasks or working at unprotected heights or around dangerous moving machinery. (Tr. 23).  The ALJ found that Claimant has no credible, medically-established physical, exertional, or other mental or nonexertional limitations.  Claimant has no past relevant work.  The ALJ opined that Claimant's residual functional capacity for the full range of exertional work is reduced by the nonexertional limitations as set forth above.  (Tr. 23).

Considering the types of work which Claimant is still functionally capable of performing in combination with her residual functional capacity for the full range of exertional work, age, and tenth grade limited education, the ALJ opined that Claimant is not disabled.  (Tr. 24).  The ALJ

thus concluded that Claimant was not under a disability at any time through the date of his decision and not entitled to child's insurance benefits and not eligible for supplemental security income. (Tr. 24).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If he is, then he is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If he is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, he is not eligible for disability benefits.  If the claimant is found

to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, he is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will he be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ failed to find Claimant disabled under either Listing 12.02 or Listing 12.05 at step three in the sequential evaluation process. Claimant further contends that the ALJ ignored the findings of Claimant's treating physicians.

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ failed to find she met Listing 12.05. Under §12.05, "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period ... before age 22." 20 C.F.R. PT. 404, Subpt. P, Appx.1 §12.05. The introductory paragraph of the Listing mandates

that the deficits in adaptive functioning be initially manifested before age 22, but the Listing does

not require a formal diagnosis of mental retardation.  Maresh v. Barnhart, 438 F.3d 897, 899 (8th

Cir. 2006).  The Regulations state that Claimant must show that his impairment satisfies "the

diagnostic description" - not the specific diagnosis - in the introductory paragraph.  20 C.F.R. Pt.

404, Subpt. P, App. 1, § 12.00A.  The Eighth Circuit in Maresh, set forth the requirements for

meeting Listing 12.05C as follows: "a claimant must show: (1) a valid verbal, performance, or full

scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and a physical or other

mental impairment imposing an additional and significant work-related limitation of function."

Maresh, 438 F.3d at 899.

The ALJ entered his decision before the Eighth Circuit issued the Maresh opinion.  Like the

Commissioner in that case, the ALJ and the Commissioner in the instant case focus on the fact that

Claimant is not mentally retarded in making the determination that Claimant does not meet Listing

§ 12.05.[3]  In his decision, the ALJ explicitly found "[f]irst of all, the claimant is not mentally

retarded."  (Tr. 21).  Because the record does not indicate whether the ALJ specifically considered

whether Claimant's mental impairment met the requirements of Listing § 12.05 as delineated in the

Maresh case, the undersigned cannot determine on the present record whether the ALJ's decision

is supported by substantial evidence, and therefore, recommends remanding this matter for

consideration under Maresh as to whether Claimant's mental condition met or medically equaled

---

[3]In the Brief in Support of the Answer, the Commissioner contends that none of Claimant's
doctors made a diagnosis of mental retardation.  Likewise, in the Sur-Reply Brief, the
Commissioner contends that Claimant's assertion that "a valid diagnosis of mental retardation is
not required to meet the listing for Mental Retardation" is not accurate.  The Commissioner
argues that "[p]laintiff's condition, with multiple diagnoses of borderline intellectual functioning,
does not meet the criteria for the listing for Mental Retardation."

the requirements of Listing § 12.05.  For the reasons set forth above, the decision of the ALJ is reversed and remanded.

Two sentences in 42 U.S.C. § 405(g) govern remands.  Shalala v. Schaefer, 509 U.S. 292, 296 (1993); Melkonyan v. Sullivan, 501 U.S. 89, 96 (1991).  Under sentence four, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with our without remanding the cause for a rehearing."  Sentence four requires substantive ruling on the correctness of the administrative decision.  Melkonyan, 501 U.S. at 98; Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  Further, case law suggests that a district court should conduct a plenary review of the entire record before entering a judgment affirming, modifying, or reversing the Commissioner's decision with or without a remand order.  See Schaefer, 509 U.S. at 297; Buckner, 213 F.3d at 1010.  As previously stated, after review of the record in this case, the undersigned finds that the cause should be remanded to the Commissioner to allow the ALJ to explicitly consider Claimant's impairments under Listing § 12.05 in light of the Maresh opinion.  Evaluation of Claimant's mental impairments in accordance with the applicable case law may change the ALJ's findings.  Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner denying social security benefits be **REVERSED** and this case be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation.  Failure to timely file objections may result in waiver of the right to appeal the questions of fact.  Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  1st  day of September, 2006.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE